Ashok K. GORWARA

v.

AEL INDUSTRIES, INC., American Laboratories, Inc., and Milton Nussbaum.

Civ. A. No. 89–6401.

United States District Court, E.D. Pennsylvania.

Feb. 11, 1992.

240

Maryann Q. Modesti, Bala Cynwyd, Pa., for plaintiff.

Ellen Rosen Rogoff, Jeffrey S. Estabrook, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

DITTER, District Judge.

This is an employment discrimination suit against an employer and a fellow employee. Plaintiff charged his employer with breach of express contract, breach of implied contract, negligent supervision, wrongful discharge, intentional interference with contractual relations, intentional infliction of emotional distress, and violations of Title VII, 42 U.S.C. § 2000e–2; the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.; and 42 U.S.C. § 1981. He charged the co-employee with intentional interference with contractual relations, intentional infliction of emotional distress, and defamation.

In an earlier opinion, Judge Lord[1] dismissed the negligent supervision, wrongful discharge, and intentional infliction of emotional distress claims against the employer only. Before me now are both defendants' motions for partial summary judgment. The employer moves for summary judgment on the breach of express contract (count I), breach of implied contract (count II), and § 1981 (count X) claims.[2] The co-employee moves for summary judgment on the charges of intentional infliction of emotional distress (count VI) and defamation (count VII).

For the reasons that follow, I will grant the employer's motion for summary judgment on the breach of implied contract claim and the § 1981 claim, and deny its motion on the express contract claim. I will grant the co-employee's motion entirely.

## I. BACKGROUND

Plaintiff, Ashok K. Gorwara, is an American citizen born in India. In February, 1988, Gorwara negotiated an employment contract with the defendant employer, AEL Industries, Inc., and its wholly-owned subsidiary, American Electronic Laboratories, Inc. (hereafter collectively called "AEL"). AEL designs and manufactures electronic systems for the military. AEL offered Gorwara the position of senior principal engineer in the microwave/hybrid engineering department with an annual salary of $70,000 and a maximum annual bonus of 10 percent. The agreement had no term setting duration.

Before Gorwara started work, he told AEL he was dissatisfied with his proposed title and salary, since he had received other managerial offers for $82,000 and for $73,-400 plus a car. Nonetheless, Gorwara told AEL on February 11, 1988, he would accept the offer and he started work two weeks later.

After two months had passed, on April 11, 1988, AEL promoted Gorwara from senior principal engineer to manager of his department. At that time, Gorwara received no corresponding increase in salary or benefits. On June 23, 1989, AEL fired him. Gorwara brought suit as described above. The charges on which AEL now seeks summary judgment are its alleged breach of express contract to increase Gorwara's salary upon promotion; its alleged breach of implied contract to employ him for a reasonable period; and its alleged discrimination, based on race and national origin, in the terms of Gorwara's second (post-promotion) employment contract.

The defendant co-employee, Milton Nussbaum, worked in AEL's marketing department throughout Gorwara's tenure with the company. He denies that any words or actions attributed to him by Gorwara amount to an intentional infliction of emotional distress or defamation.

## II. ANALYSIS

To prevail on their motions for partial summary judgment, the defendants must show that the pleadings, depositions, answers to interrogatories, and admissions on

---

1. Upon Judge Lord's death, this case was transferred to me.

2. The employer also moves for summary judgment on the ADEA claim (count IX), which plaintiff claims he has agreed to withdraw. I

have not received any stipulation of withdrawal of this charge. I will therefore grant the summary judgment motion as unopposed and enter judgment in favor of defendants and against plaintiff.

file, together with the affidavits, show that there is no genuine issue as to any material fact, and that defendants are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).[3]

## A. *AEL's Motion for Partial Summary Judgment*

### 1. Breach of Express Contract (Count I)

Gorwara alleges AEL breached the parties' express, oral agreement when it failed to increase his salary, bonus, and benefits upon promoting him from senior principal engineer to department manager.[4] Gorwara claims both Joe Iervolino, vice president of the microwave/hybrid engineering department, and Raymond Griffin, AEL's director of human resources, promised during his employment negotiations that "if and when" Gorwara became manager, he would get a significant salary raise. Iervolino allegedly read Gorwara's offers from the other companies and promised: "I am going to take this [the letters] as ... evidence for Mark Ronald [president of AEL] and show him this as to what your capability is, and if and when you become manager, we will make sure that you get this kind of salary." "After you have proven your worth at AEL and when you become a manager, we will give you a higher salary."

AEL contends neither Griffin nor Iervolino ever expressly promised Gorwara an increase in pay.[5] It claims even if Iervolino did state those words, he merely promised to consult with Mr. Ronald, not actually to deliver more money. In any case, AEL

argues, promises of "a higher salary" and "this kind of salary" are by law too indefinite to enforce.

■ Under Pennsylvania law, it is Gorwara's burden to establish the existence of an oral contract by "clear and precise" evidence. *Browne v. Maxfield*, 663 F.Supp. 1193, 1197 (E.D.Pa.1987). A contract is enforceable only if both parties manifested an intent to be bound, it is supported on both sides by consideration, and its terms are sufficiently definite. *See Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 298–99 (3d Cir.1986).

■ Gorwara's evidence is clear and precise. Iervolino referred to Gorwara's other offers and said, "we will make sure you get this kind of salary," as soon as Gorwara balked at AEL's $70,000.[6] No one disputes the promise was supported on both sides by consideration. Since the parties' contract was terminable at will (see § I.2 *infra*), and Gorwara therefore had no enforceable obligation to work for AEL even after he had formally accepted, all promises made up to February 29, 1988, when he started working, constitute consideration for his taking the job. In any case, AEL does not deny the promotion from senior principal engineer to manager merits some raise in salary and bonus. Iervolino confirmed that in April, 1988, Gorwara "went into a different bonus program," and that because of his increased contributions in 1988, he received a 5 percent higher annual bonus than other staff engineers.

■ Finally, while Griffin's commitment to "a higher salary" may be too vague, Iervolino's promise of "this kind of salary,"

<hr/>

3. Jurisdiction over Gorwara's Title VII, ADEA, and § 1981 claims is based on the federal question statute, 28 U.S.C. § 1331. Jurisdiction over his common law claims is based on diversity of citizenship, the amount in controversy exceeding $50,000. *Id.* § 1332. The parties agree Pennsylvania law governs the common law claims.

4. Gorwara also asserts in count I that AEL breached the parties' *express* employment agreement by discharging him in bad faith. There is no support in the record for any express promise by AEL *to fire Gorwara only for cause.* At

most, Gorwara's allegations support a possible *implied* promise by AEL, which, as I explain at 245, n. 9, is also insufficiently supported by the record.

5. AEL does not deny, however, that Griffin and Iervolino had the authority to enter into a binding employment contract on its behalf with Gorwara.

6. *Compare, e.g., Frymire v. PaineWebber, Inc.,* 107 B.R. 506 (E.D.Pa.1989) (no breach where defendant promised to *try* to get a higher salary for plaintiff, and tried but failed).

referring directly to Gorwara's other offers of $82,000 and $73,400 plus a car, is sufficiently definite to enforce.[7] In *Browne, supra,* Judge Pollak found that the promise of a salary of somewhere between $75,000 and $125,000 guaranteed the plaintiff at least $75,000. *See Browne* at 1197–98. Here, accordingly, AEL's alleged promise of "this kind of salary" guaranteed Gorwara a raise to an amount approximating the lesser of his other two offers ($82,000 or $73,400 plus a car.) Whether the increased bonus discharged AEL's obligation is a jury question.

AEL may well have expressly promised Gorwara a raise it did not deliver. I will deny the motion for summary judgment on the breach of express contract charge.

### 2. Breach of Implied Contract (Count II)

In count II, Gorwara alleges AEL breached an implied promise to employ him for a reasonable period when it discharged him after only 16 months. He claims AEL implicitly promised to fire him only for cause, but fired him without cause in June, 1989.

Under Pennsylvania law, employment contracts of indefinite duration, such as Gorwara's, are presumed terminable at the will of either party. Therefore, unless Gorwara's agreement is removed from that presumption, AEL could not have been required to retain Gorwara, and its motion for summary judgment must be granted.

▮ Gorwara contends the at-will presumption here is rebutted. The presumption can only be overcome by clear and specific evidence showing the parties' *intended* their contract to extend a certain period, *see Di Bonaventura v. Consolidated Rail Corp.,* 372 Pa.Super. 420, 425, 539 A.2d 865, 868 (1988), or by evidence showing the employee gave the employer "additional consideration other than the services for which he was hired." *Darlington v. General Elec.,* 350 Pa.Super. 183, 199, 504 A.2d 306, 314 (1986). This kind of consideration, meant to substitute for evidence of

express intent, is narrowly defined. In *Darlington,* the court wrote:

> The term "consideration" is not used here as it is in the usual contractual context to signify a *validation* device. The term is used, rather, more as an *interpretation* device. When "sufficient additional consideration" is present, courts infer that the parties *intended* that the contract will not be terminable at-will.... Or, if the parties did not *actually so intend* (but did not intend to the contrary, either), then *fairness* requires that the employer, who has been given the additional consideration, cannot terminate the employment without just cause. *Id.* (emphasis in original)

In other words, to overcome the at-will presumption *without* clear and precise evidence that both parties meant to bind themselves for a definite period, an employee must establish he provided special consideration from which a court can *infer* the parties intended the employment to extend for a fixed time. Only if the court gleans this type of agreement from the evidence should it interpret the contract as being *other than* ordinary and terminable at-will.

*Darlington* explained that a classic example of this kind of evidence or consideration for an employment contract is the sale of the employee's business to the employer. *See id.,* citing *Huguet v. Foodsales, Inc.,* 19 Pa.D. & C.3d 376 (1980). "Sufficient additional consideration" exists in extraordinary employment contracts which "indicate that the employee has come to the employment relationship with bargaining strength greater than that of the usual employee." *Id.* It is special consideration, therefore, of a qualitatively different type from the ordinary employee-employer exchange, which shows both parties meant their contract to extend for some definite amount of time.

Two cases describe the rare circumstances which attend such "sufficient additional consideration." In *Bravman v. Bas-*

---

7. For a case in which the alleged agreement's terms were too indefinite to enforce, *see Engstrom v. John Nuveen & Co.,* 668 F.Supp. 953, 961–62 (E.D.Pa.1987). There, an employer allegedly promised the plaintiff "excellent treatment in salaries, bonuses and promotion," and to "make up" for plaintiff's lost stock investments.

*sett Furniture Industries, Inc.*, 552 F.2d 90, 92–93 (3d Cir.1977), *cert. denied,* 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977), the plaintiff, an established furniture manufacturers' representative, gave up representation of all other furniture manufacturers in return for the exclusive right to solicit orders for certain Bassett products. He personally guaranteed the creditworthiness of several customers and hired, at Bassett's insistence but at his own expense, a full-time associate to help cover his sales territory. *See id.* at 93. However, the parties had no written contract and had never discussed duration or termination. After some time, Bassett told Bravman to stop representing those lines of furniture and to devote himself instead to the exclusive representation of Bassett case goods. Bravman sued for breach of implied contract to employ him for a reasonable time in the earlier capacity. The Third Circuit held that under the circumstances, a jury could find Bravman had given Bassett "sufficient additional consideration" through his extraordinary detriment (sacrificing all other manufacturers' business) and Bassett's extraordinary benefit (Bravman's exclusive representation). It would be *unfair,* the court reasoned, to read these transfers as an ordinary employer-employee exchange in a typical at-will contract. Clearly, Bravman would not have agreed to represent Bassett exclusively had he thought Bassett could discharge him at any time without cause.

In *Marder v. Conwed Corp.*, 75 F.R.D. 48 (E.D.Pa.1977), the plaintiffs, also manufacturer's representatives, performed "missionary work," laying the groundwork for substantial sales of their principal's product to government agencies. The Marders succeeded in getting the product onto government purchase lists but were terminated before they could receive commissions from actual purchases. They sued, arguing their extra missionary work and expertise in soliciting the government constituted sufficient additional considera-tion—extraordinary efforts they would not have made had they thought Conwed could discharge them freely without cause. The court held a jury could find this additional consideration—"although barely so." *Id.* at 58. It held it would be unreasonable to think the Marders would have performed the missionary work with no return, had they thought Conwed could fire them just before the profits from that work began to materialize.

■ In this case, Gorwara claims he, like Bravman and the Marders, transferred additional consideration to his employer sufficient to take his employment contract out of the at-will presumption. His alleged consideration, however, does not suggest a contemporaneous, mutual agreement with AEL to be bound for a reasonable period. Rather, Gorwara claims he performed work for AEL over and above his job description, and that by accepting (indeed, requiring) this work, AEL implicitly promised to employ him for a reasonable period. As a matter of law, this kind of evidence or "consideration" is not sufficient to override Pennsylvania's at-will presumption.

Gorwara claims shortly after he was promoted, several engineers in the department were either fired by or resigned from AEL. Gorwara claims Iervolino blocked his attempts to refill those positions and forced him to do the work of six other people.[8] According to Gorwara, Iervolino knew he would not complain since, seeking to stay and work in the United States, Gorwara needed the favorable opinion of a prestigious American company.

Even *assuming* AEL forced such a burdensome workload upon him, Gorwara's performance does not constitute the kind of additional consideration which can override the at-will presumption. First, insofar as Gorwara worked overtime either to reorganize his department or to cover temporarily for displaced employees, he merely fulfilled his obligations. Additional consideration will not be found where an employee incurs

---

**8.** Gorwara also claims he was required to "expend inordinate effort to effectuate AEL's goals for the Microwave/Hybrid Division," when he was first hired. He does not explain or doc-ument the nature of this effort, however. I will therefore consider it like the rest of his perform-ance at AEL which, as I explain *infra,* does not constitute sufficient additional consideration.

detriment "commensurate with that incurred by all manner of salaried professionals." *Darlington,* 350 Pa.Super. at 201, 504 A.2d at 315.

More significantly, however, the only thing Gorwara gave AEL as "additional consideration" was more work than he thought (or maybe even agreed) he would have to do. But his compliance with AEL's allegedly unreasonable demands does not remove him to the narrow category of cases where a court infers the parties' original plan to be bound for a definite period. AEL's allegedly extraordinary impositions may reflect some significant tension between it and Gorwara. But Gorwara's performance does not establish ex post AEL's agreement to keep Gorwara on. By doing *even* extraordinary work at the behest of the employer, an employee does not transform his employment contract from terminable at-will to binding for a reasonable period.

Unlike Bravman and the Marders, Gorwara was paid for every day he worked at AEL. Whereas the plaintiffs in those cases could reasonably be said to have been *promised* a chance to recoup their investments of money and time, since a jury could find it unlikely they would have given up their other clients or deferred their income otherwise, Gorwara was regularly salaried. Therefore, a jury could not make the same inference that absent such a promise, Gorwara would not have continued to work.

Finally, Gorwara presents no evidence of how long the "reasonable period" of employment which AEL promised should have been. In *Bravman* and *Marder,* the courts explained that juries must be able to calculate how long the plaintiffs would have needed to remain employed to earn a fair return on their consideration. *See Marder* at 60. Here, however, Gorwara assumes 16 months was too short, but gives no basis (nor could he) for determining a fairer length of employment. He was paid a steady salary, and though arguably it was too little, there was no evidence from which a jury could make an objective determination of the time Gorwara needed to recoup his "investment." At best, there is a suggestion that for some vague, indefinite time, Gorwara feels he should have kept his job. AEL's motion for summary judgment on the breach of implied contract claim must be granted.[9]

### 3. 42 U.S.C. § 1981 (Count X)

In count X, Gorwara asserts AEL violated 42 U.S.C. § 1981 by discriminating against him on the basis of his race, national origin, and lack of United States citizenship[10] in refusing to increase his salary when he was promoted.[11] Specifically, Gorwara claims AEL named him department manager and demanded managerial performance, but discriminatorily denied him the pay and benefits appropriate to his new role. Gorwara claims AEL took advantage of his unwillingness to quit because it knew he needed to re-establish himself in western culture, to obtain pro-

---

**9.** Gorwara argues, in addition, that a longer employment contract could be implied from the practice and policy of AEL, as well as other electronics companies, not to discharge managers absent misconduct, insubordination, or specific cause. But even after discovery, Gorwara has failed to document such a practice or policy.

In any case, such a practice or policy would be legally insufficient to show the parties' intent to overcome the at-will presumption. The Third Circuit recently held that where company policy authorizes discharge for "cause" but does not define that term, as is the case here, the employer can still decide subjectively which "cause" warrants discharge. *See Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 661 (3d Cir.1990).

**10.** Gorwara did not become a U.S. citizen until 1989.

**11.** Gorwara also asserts that AEL discriminated against him on the basis of his race in the formation of his original employment contract, and interfered with his attempts to enforce his employment contracts. He never develops these allegations, however, and his opposition to AEL's motion for summary judgment on the § 1981 claim speaks entirely to AEL's alleged actions regarding the promotion. Additionally, Gorwara has never substantiated his claim that AEL discriminated against him because he was not an American citizen. I will therefore grant summary judgment to AEL on these aspects of Gorwara's § 1981 claim.

fessional references in the United States, and to acquire U.S. citizenship.

I note here the inconsistency between this allegation and Gorwara's earlier one: AEL breached its express promise to pay him more upon promotion. Either the parties formed one contract in February, 1988, in which AEL promised to promote Gorwara and pay him accordingly—or the parties entered this new and distinct contract in April, 1988, on what Gorwara claims are discriminatory terms. At this stage in the litigation, I could permit Gorwara to maintain inconsistent grounds for relief. However, since I will dismiss Gorwara's § 1981 claim for failure to establish discriminatory intent, the inconsistency is irrelevant.[12]

■ A successful § 1981 claim requires proof of intentional or purposeful discrimination. *See General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 389, 102 S.Ct. 3141, 3149, 73 L.Ed.2d 835 (1982); *Chauhan v. M. Alfieri Co.*, 897 F.2d 123, 126 (3d Cir.1990). Because of the evidentiary difficulties involved in proving discriminatory intent, the Third Circuit has held that summary judgment motions in § 1981 cases are governed by the well-known burden shifting provisions laid down in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) and refined in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). *See Chauhan, supra* at 126.[13]

Gorwara establishes a prima facie case by proving: 1) he belongs to a protected class; 2) he received a promotion which the company acknowledges merits higher pay; 3) he performed the work of the higher position; and 4) he did not receive pay commensurate with his work. Once a prima facie case is established, the burden shifts to AEL to offer a legitimate, non-

discriminatory reason for refusing to pay Gorwara more. If AEL proffers such a reason, the burden shifts back to Gorwara to show that AEL's explanation is pretextual. *See id.* at 127.

■ Gorwara has established a prima facie case. He belongs to a group of people potentially "subjected to intentional discrimination solely because of their ancestry or ethnic characteristics," *St. Francis College v. Al–Khazraji*, 481 U.S. 604, 2022, 2028, 95 L.Ed.2d 582 (1987). He was promoted. He did manage the department. He did not receive the full salary which, according to him, AEL had assured him was appropriate.

AEL offers the following explanation in response: Gorwara did not receive his immediate salary increase in April, 1988, for two reasons: first, he had worked for AEL less than two months, and second, he was already at the top of the salary range for managers. AEL claims Gorwara was told his promotion increase would be reflected instead in his yearly bonus-review. In fact, at the end of 1988, Gorwara did receive a 9 percent bonus, where other employees received only 4 percent.

The burden now shifts to Gorwara to "point[ ] to evidence which calls into question the defendant's intent," or which "establish[es] a reasonable inference that the employer's proffered explanation is unworthy of credence." *Chauhan, supra* at 127 (footnotes omitted). Gorwara must present evidence, direct or circumstantial, from which a reasonable jury could conclude AEL's explanation is false or pretextual. *See id.* at 128.

Gorwara fails to meet this burden. His only assertion of pretext is that AEL encouraged or at least acquiesced in its other employees' racial and national origin discrimination against him. This, he says, proves AEL's justification is false and pre-

---

**12.** Both parties devote much time to the question of whether Gorwara's promotion to department manager constituted a sufficiently "new and distinct" employment relation to trigger the protections of § 1981. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989). Since I will grant AEL's motion for summary judgment on the

ground of insufficient allegations of intent, I decline to reach this question.

**13.** Gorwara originally filed this suit in September, 1989, under civil rights legislation as it existed at that time. I adjudicate his rights accordingly.

textual. I disagree. Gorwara *did* receive extra money in 1988 for his increased performance in the form of his 9 percent bonus. While Gorwara may prefer the $82,-000 or $73,400 plus a car, the equivalent he claims Iervolino promised him, he can seek that amount under his breach of express contract theory. For a § 1981 claim, however, Gorwara would need to show some evidence of discriminatory animus or purpose, based on race or national origin, underlying AEL's alleged refusal to pay him sufficiently for his work. Gorwara fails to establish this requisite intent. As a matter of law, AEL's motion for summary judgment on the § 1981 claim must be granted.

B. *Milton Nussbaum's Motion for Partial Summary Judgment*

1. Intentional Infliction of Emotional Distress (Count VI)

With regard to his co-employee Milton Nussbaum, Gorwara alleges Nussbaum specifically intended to cause him emotional distress by denigrating his national origin and his work style. His claim is not supported by the evidence.

■ Under Pennsylvania law, courts have found intentional infliction of emotional distress "only where the conduct at issue has been 'atrocious' and 'utterly intolerable in a civilized community.'" *Clark v. Falls*, 890 F.2d 611, 623 (3d Cir.1989) (quoting Restatement (Second) of Torts § 46, comment d). The tort is not intended to redress "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Restatement (Second) of Torts § 46, comment d (1965). In order to cull out the atrocious from the mere insults, I must determine first whether, as a matter of law, reasonable jurors could find extreme or outrageous conduct. *See Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1274 & n. 9 (3d Cir.1979).

Gorwara attributes a series of comments to Nussbaum. Nussbaum allegedly said at one meeting, "There are all chiefs here and no Indian [sic]," and at another, "[T]here is all Indians [sic] here and no chiefs." Gorwara also testified he walked in on a conversation between Nussbaum and two engi-neers, Paul Kurland and Joe Kopski, after Kurland had just received a warning about the quality of his work and several other engineers had just been fired or had resigned. Kopski allegedly stated, "[T]hese Indians believe in a cast [sic] system. That is why [Gorwara] always stands up for Joe Iervolino. * * * [D]on't you see every time Joe walks into [Gorwara's] office, [Gorwara] stands up. This is what Indians do." Nussbaum allegedly responded, "I wonder what cast [sic] does [Gorwara] belong to?"

Later that day, Gorwara allegedly overheard Nussbaum say to other AEL employees, "[I]f things go on in this division as they are, there will only be an Indian left because everyone else will leave." Further, Nussbaum was "always leaning toward where one could get on his personal basis what he thought of Indians." Gorwara gives as an example: after Gorwara's presentation to an AEL client, Nussbaum only talked about how much work remained, and did not acknowledge the good presentation Gorwara had made. Last, Gorwara states that Steve Dittman, one of the department's line engineers, told him Nussbaum had criticized Gorwara during a business trip and engaged in "a lot of backbiting." Dittman said Nussbaum has "something personal towards you."

Gorwara's intentional infliction of emotional distress claim fails as a matter of law. While Nussbaum's comments and unspecified "badmouthing" and "backbiting" may have made Gorwara's workdays unpleasant, these comments are precisely the type of insults, indignities, annoyances, and petty oppressions the tort of intentional infliction of emotional distress does not address. *See* Restatement (Second) of Torts § 46, comment j ("The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it").

■ Second, the comments about there being "all chiefs and no Indians" and "no chiefs and all Indians" did not cause Gorwara the type of severe distress required under this tort. Gorwara admitted, "I didn't mind those types of phrases. They

were quite common and from time to time they would occur."[14]

Nor did Nussbaum's other comments, referring to the Indian caste system, the department's remaining work, or his personal dislike of Gorwara, subject Gorwara to the kind of emotional distress this tort prohibits. Gorwara contends he suffered from atrocious behavior comparable to that in *Chuy, supra,* and *Hoffman v. Memorial Osteopathic Hosp.,* 342 Pa.Super. 375, 492 A.2d 1382 (1985). I disagree. In *Chuy,* a football player was permitted to recover for intentional infliction of emotional distress from a team doctor who told a newspaper reporter that the player suffered from a potentially fatal disease, knowing he did not. In *Hoffman,* a patient who was later diagnosed with an affliction causing neurological paralysis could recover against a doctor who had refused to treat him in a hospital emergency room, had told him he was not ill and to go home because the doctor had sick patients to care for, and had ordered his staff not to help the plaintiff up, even after the plaintiff had fallen, crying and unable to move.

Gorwara's suffering hardly rises to the level of such "atrocious" or "utterly intolerable" treatment. I will grant summary judgment to Nussbaum on count VI.

### 2. Defamation/Slander (Count VII)

 Gorwara also claims Nussbaum's "constant assault upon [his] national origin" defamed him as "deficient in his professional skills." He claims that while Nussbaum's comments taken individually may not have defamed him, Nussbaum's overall barrage of comments, based on Gorwara's Indian background, slandered him generally.

Under Pennsylvania law, a defamatory statement is one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 923 (3d Cir.), *cert. denied* — U.S. ——, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990), quoting *Birl v. Philadelphia Elec. Co.,* 402 Pa. 297, 303, 167 A.2d 472, 475 (1960) and Restatement of Torts § 559 (1938). It is for the court to determine, in the first instance, whether the statement of which the plaintiff complained is capable of a defamatory meaning; only if it is should a jury decide if it was so understood by the reader or listener. *Id.* I hold that Nussbaum's comments, even considered as some sort of unit, are incapable of inflicting this kind of reputational harm, and Nussbaum's motion for summary judgment must be granted.

Nussbaum's comments about "all chiefs and no Indians" may not have referred to Gorwara at all, as discussed earlier. Gorwara admits he understood the expression was a common one which, while perhaps insensitive, caused him no real injury.

 Similarly, Nussbaum's query, "I wonder what cast[e] does [Gorwara] belong to," neither lowered Gorwara in his co-workers' estimation nor deterred their willingness to deal with him. At most, the comment reflected Nussbaum's agreement with Kopski that because Gorwara is Indian, he probably adheres to a system based on deference to superiors. As a query rather than a statement, the words may be technically incapable of defamation. But in any case, Nussbaum's underlying accusation that Gorwara defers to superiors at work cannot, as a matter of law, defame his reputation.

 It may be argued that Nussbaum's unspecified "backbiting" to Steve Dittman, and his comment, "if things go on in this division as they are, there will only be an Indian left because everyone else will leave," defamed Gorwara by calling into

---

**14.** In any case, I am more inclined to believe that these expressions did not implicate Gorwara at all. The idiom "too many chiefs and not enough Indians" is an old Navy expression reflecting a seaman's (here, employee's) grievance that too many superiors are giving orders and there are too few workers, like themselves, to carry them out. In choosing these expressions, Nussbaum may have intended a reference to Gorwara's national origin. Nevertheless, no reasonable juror could find that these statements subjected Gorwara to the kind of emotional distress for which the law provides redress.

question his ability to perform his job. *See Roffman v. Trump*, 754 F.Supp. 411, 419, n. 10 (E.D.Pa.1991) (factual assertions must be capable of defamatory meaning if they accuse plaintiff of inability to perform adequately in his chosen profession). However, considering the context and audience of these statements, I find that these particular comments could not have defamed Gorwara. *See Baker v. Lafayette College*, 516 Pa. 291, 296, 532 A.2d 399, 402 (1987) ("the test to be applied is 'the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate' " (footnote omitted)).

The record provides no details of Nussbaum's alleged comments to Dittman on the business trip. Therefore, I will not conclude Nussbaum's comments seriously harmed Gorwara's reputation. Nor would I assume the remarks had much significant effect, since Dittman is not alleged to have had any supervisory relation to Gorwara.

 Regarding Nussbaum's statement that there will "only [be] an Indian left," I note first that the comment could not be defamatory *simply* because it names Gorwara's national origin. One cannot defame another merely by naming his race or ethnic background unless the label carries with it some derogatory message which the speaker intends *and* the audience understands. An accurate label or name, standing alone, does not defame.

Yet the comment is arguably defamatory because it suggests no one wanted to work with Gorwara. Given its context, however, I find it was not capable of defamatory meaning. According to Gorwara, Nussbaum made this statement to two other AEL employees within earshot of Gorwara's immediate superior, Joe Iervolino, and David Walker, manager of the department's manufacturing operations. The employees were talking informally after several AEL engineers had either resigned or been fired, and Gorwara had just been promoted to manager.

First, the remark that "everyone else will leave" could not have been interpreted as literally true. According to the Restatement (Second) of Torts § 566, comment e (1977):

there are some statements that are ... statements of opinion, or even of fact, which cannot reasonably be understood to be meant literally ... and are obviously vituperation and abuse.... No action for defamation will lie in this case.

Clearly, Nussbaum's remark was exaggeration.

Second, I find Nussbaum was indulging informal, office griping against the superior he thought caused his co-workers to leave. Everyone who heard him already knew what part, if any, Gorwara had played in the department's reorganization. Nussbaum communicated nothing new to them about either Gorwara's personal or professional skills. Significantly, none of those listeners testified that his comment did influence their "estimations" of Gorwara or their desire to associate with him.

Any other holding on this claim would expose a myriad of employees to defamation lawsuits and unnecessarily implicate the First Amendment. There is no evidence from which a reasonable juror could find these co-workers either thought less of Gorwara or shunned him as a result of Nussbaum's remarks, whether taken individually or as a whole. I will grant Nussbaum's motion for summary judgment on Gorwara's charge of defamation.

### III. CONCLUSION

Based on the foregoing analysis, I conclude a triable, material issue of fact exists with respect only to Gorwara's breach of express contract claim. Accordingly, AEL's motion for summary judgment will be denied on count I of Gorwara's second amended complaint. No material issues of fact remain on either Gorwara's breach of implied contract or his § 1981 claim against AEL, or against Nussbaum for his intentional infliction of emotional distress or defamation. I will therefore grant AEL's motion for summary judgment on counts II and X as well as Nussbaum's motion for summary judgment on counts VI and VII.

Gorwara's intentional interference with contractual relations claim against both defendants and his Title VII claim against AEL have not been challenged and therefore await trial. An order follows.

### ORDER

AND NOW, this 11th day of February, 1992, it is hereby ordered that:

1. The motion of defendants AEL Industries, Inc., and American Electronic Laboratories, Inc., for summary judgment on count I of the second amended complaint is denied.

2. The motion of AEL Industries, Inc., and American Electronic Laboratories, Inc., for summary judgment on count IX is granted as unopposed. Judgment is entered in favor of AEL Industries, Inc., and American Electronic Laboratories, Inc., and against Gorwara.

3. The motion of defendants AEL Industries, Inc., and American Electronic Laboratories, Inc., for summary judgment on count II is granted. Judgment is entered in favor of AEL Industries, Inc., and American Electronic Laboratories, Inc., and against Gorwara, on count II.

4. The motion of AEL Industries, Inc., and American Electronic Laboratories, Inc., for summary judgment on count X is granted. Judgment is entered in favor of AEL Industries, Inc., and American Electronic Laboratories, Inc., and against Gorwara, on count X.

5. The motion of defendant Milton Nussbaum for summary judgment on count VI is granted. Judgment is entered in favor of Nussbaum and against Gorwara on count VI.

6. The motion of defendant Milton Nussbaum for summary judgment on count VII is granted. Judgment is entered in favor of Nussbaum and against Gorwara on count VII.