### Chestnut v. Clover

400

*Brian P. Pincus,* for plaintiffs, Chestnut.
*Michael J. D'Aniello,* for plaintiff, McIntosh.
*John A. Fitzpatrick,* for defendant.

HILL, *J.,* December 8, 1994—

## I. PROCEDURAL HISTORY

These two shopkeeper false imprisonment cases, consolidated for trial, were brought by Bridgette McIntosh, minor, and by Regina Chestnut, parent and natural guardian of Oona Chestnut, minor, against department store Clover, a division of Strawbridge and Clothier Inc. Both plaintiffs claimed compensatory and punitive damages for assault, battery, false imprisonment, and intentional infliction of severe emotional distress as a result of Bridgette's and Oona's September 1, 1988 detention by Clover employees on suspicion of retail theft.

A trial began with jury selection on February 14, 1994. In the course of the trial, the court nonsuited plaintiff McIntosh's claim for intentional infliction of severe emotional distress, refused to charge the jury on punitive damages for McIntosh, and limited the jury's consideration of punitive damages for plaintiff Chestnut to the manner in which she was allegedly touched by Clover's employees.

The jury returned a verdict on February 18, 1994, finding for plaintiff McIntosh on her false imprisonment claim and awarding her $35,000 in compensatory damages. The jury returned an inconsistent verdict in the Chestnut case, failing to find in favor of plaintiff Chestnut on any of her causes of action yet nevertheless awarding her $13,500 in compensatory damages. The jury awarded nothing in punitive damages to plaintiff Chestnut.

Following the trial, on February 28, 1994 the court molded the verdict in favor of plaintiff Chestnut on her false imprisonment claim for $13,500.

Post-trial motions were filed by both plaintiffs and defendant Clover. Plaintiff McIntosh filed post-trial motions requesting delay damages, a court en banc, and a new trial limited to punitive damages only. Plaintiff Chestnut filed post-trial motions requesting delay damages, a court en banc, and a new trial limited to punitive damages only for all of Clover's actions other than the manner of touching. Defendant Clover filed post-trial motions in both cases requesting judgment notwithstanding the verdict, a new trial, or remittitur.

The court denied both plaintiffs' motions for a court en banc on March 11, 1994.

The court heard oral argument on the post-trial motions on November 7, 1994.

After a detailed review of the notes of trial, the parties' briefs, the oral argument, and the applicable law, plaintiff McIntosh's motion for a new trial on punitive damages is denied. Plaintiff Chestnut's motion for a new trial on punitive damages is also denied. Defendant Clover's motions for either judgment notwithstanding the verdict or remittitur is denied for both cases. Defendant Clover's motion for a new trial is granted in both cases. Because a new trial is ordered for both cases, plaintiff McIntosh's and plaintiff Chestnut's motion for delay damages is denied.

## II. FACTS

In the early afternoon of September 1, 1988, cousins Oona Chestnut, then 13 years old, and Bridgette McIntosh, then 14 years old, entered the Clover department store at Penrose Plaza on Lindbergh Boulevard in Philadelphia. They were accompanied by Chestnut's brother Alphonse McIntosh and his girlfriend Karla Rone, both then 18 years old. (N.T., 2/15/94, 14.)

Sharing one shopping cart, the four proceeded around the store, shopping for approximately one hour. They were monitored during most of that time by a Clover security employee sitting in a back room watching television screens attached to surveillance cameras located around the store. (N.T., 2/16/94, 321-322.) One of the television screens was attached to a videotape recorder (N.T., 2/16/94, 315), thereby allowing most of the group's activities while shopping to be videotaped. (Def. exhibit D-1.) During the hour they shopped, the security employee monitoring the televisions observed both Oona Chestnut and Bridgette McIntosh putting items into the shared shopping cart. (N.T., 2/16/94, 340-341.)

After completing their shopping, the four entered one of the checkout lanes. It was learned later that the cashier in the checkout lane chosen was a friend of Oona's and Alphonse's mother, and that Oona, Alphonse, and Bridgette all referred to the cashier as "Aunt." (N.T., 2/15/94, 18-19, 84.) Still being observed by the store security employee on the television screens, they began emptying their selections onto the checkout conveyor.

Alphonse McIntosh was checked out first. He presented items with a retail value of $132.50 which the cashier rang up as $12.59. (N.T., 2/16/94, 277, 279.) Alphonse then tendered $12.59. This "under-ring" was noted by the security employee in the back room using a device that monitored the cash register at the same time a camera monitored the checkout lane. (N.T., 2/16/94, 327.)

Meanwhile, Karla Rone had left the checkout lane, telling her friends she was going elsewhere in the store to get something to eat. (N.T., 2/14/94, 19.) Bridgette McIntosh testified that before leaving, Karla Rone

handed her some money and asked her to pay for her—Karla's—items. (N.T., 2/15/94, 19-20.)

Oona Chestnut was the next to check out. She bought a candy bar for which she paid the full retail price. (N.T., 2/14/94, 84.)

Bridgette McIntosh was the next and last to go through the checkout lane. She presented items with a retail value of $14.46 which the cashier rang up as $6.22. (N.T., 2/16/94, 280.) Bridgette then tendered $6.22. This second under-ring was noted, like the first, by the security employee in the back room using the cash register monitoring device in conjunction with the surveillance camera.

After Bridgette McIntosh had gone through the checkout lane, the three, now rejoined by Karla Rone, proceeded toward the exit of the store. They had not reached the outer doors when they were stopped by the store's security guards. (N.T., 2/15/94, 22, 58, 85.) These guards, alerted to the under-rings by the security employee in the back room (N.T., 2/17/94, 418), then led the three girls and Alphonse McIntosh to the back of the store. (N.T., 2/17/94, 23, 85, 419.) There they were assembled in a back room—the store's "security office," (N.T., 2/16/94, 332)—adjacent to the television monitoring room. The time was approximately 2:15 p.m. (N.T., 2/17/94, 436.)

Because there were no surveillance cameras in the security office, there is no videotape record of what happened next. However, there was testimony that each of the four was searched, one at a time in the television monitoring room, and the contents of their bags were examined. (N.T., 2/15/94, 25, 89, 2/16/94, 230.) Neither the store's records nor the testimony is clear as to which of Clover's employees actually performed the searches, but Oona Chestnut testified that the woman who

searched her "[F]elt my chest and she felt my butt and in between my legs in my private areas." (N.T., 2/15/94, 89-90.) Oona Chestnut went on to testify that this made her "uncomfortable." (N.T. 2/14/94, 90.) Neither Bridgette McIntosh nor Karla Rone testified to having a similar experience during their searches. Both instead described a standard patdown. (N.T., 2/15/94, 25-26, 2/16/94, 290.)

Bridgette McIntosh, Oona Chestnut, and Karla Rone testified that during their detention in the back room, the store's security personnel made reference to the possibility of the group "going to jail" for stealing. (N.T., 2/15/94, 24, 29, 87, 2/16/94, 230.) According to both Bridgette McIntosh and Oona Chestnut, the security personnel's references to jail were done in a "teasing" manner. (N.T., 2/15/94, 29, 87.) Both also testified that neither the security personnel nor any other Clover employee ever explained to them specifically what they had done to cause their detention. (N.T., 2/15/94, 23, 27, 32, 43, 87, 91.)

Approximately 30 or so minutes after first being brought to the back room, Oona Chestnut and Karla Rone were permitted to leave the store. (N.T., 2/15/94, 32, 92, 2/17/94, 513.) In the meantime, Clover security personnel had called the police. (N.T., 2/17/94, 446-449.) Bridgette and Alphonse McIntosh continued to be detained in the security office without further incident until the police arrived. Both were then taken into police custody at approximately 4:15 p.m. (N.T., 2/17/94, 428.) They were released sometime later that day.

Clover subsequently declined to press charges against any of the four.

## III. DISCUSSION

### A. *Defendant Clover's Motions for Post-Trial Relief*

#### 1. Defendant Clover's Contention That the Jury Returned an Inconsistent Verdict When It Failed To Find That Plaintiff Chestnut Proved a Cause of Action Against Defendant, Yet Nevertheless Awarded Her Damages

Defendant Clover contends that the jury returned an inconsistent verdict in the Chestnut case. It further contends that because the inconsistencies in the verdict were irreconcilable, it is entitled to judgment notwithstanding the verdict or, alternatively, a new trial.

Clover correctly points out that the jury's responses to interrogatories on the verdict report seem to indicate that plaintiff Chestnut failed to prove a cause of action against it. The jury found that Clover's employees did not commit an assault on Chestnut. It found that Clover's employees did not commit a harmful or offensive touching that would thereby constitute a battery of Chestnut. It found that although Clover's employees did intentionally detain Chestnut against her will, this detention was not a legal cause of harm to her, and therefore did not constitute false imprisonment.[1] And lastly, it

---

1. Plaintiff Chestnut argues that the apparent inconsistency of the jury's verdict is a direct result of the way the interrogatory on false imprisonment was worded. As submitted to the jury, question no. 25, under section L, "False Imprisonment," read: "Was the detention of plaintiff Chestnut the *legal cause of harm* to her?" (emphasis added)

Although "legal cause of harm" was explained to the jury in the court's charge, Chestnut contends that the jury was confused

found that Chestnut suffered no intentional infliction of severe emotional distress as a result of her detention.

These findings were dispositive of all of Chestnut's claims against Clover. Yet although they ostensibly found no proven cause of action, the jury nevertheless went on to award Chestnut $13,500 in compensatory damages. This inconsistency in the verdict is the basis of Clover's instant complaint.

In its brief, Clover cites several cases in support of its contention that the above referenced inconsistency was irreconcilable, and therefore incapable of subsequent judicial molding. It is not possible to reach the merits of this argument, however, because Clover's failure to object to the verdict inconsistency before the jury was dismissed constitutes a waiver.

by the use of the phrase, equating it with a notion of "was the harm caused her legal?" This, she argues, is the reason why the jury answered the question in the negative.

Chestnut compares the corresponding interrogatory on false imprisonment given for plaintiff McIntosh, question no. 11, under section E, "False Imprisonment," which read: "Was the detention of plaintiff McIntosh a *substantial factor* in bringing about harm to her?" (emphasis added) Because the jury answered "yes" to this question and answered "no" to question no. 25 above on what, according to Chestnut, was a similar set of underlying facts for both her and McIntosh, Chestnut claims the jury was confused as to what question no. 25 actually meant. Further, because its award of $13,500 in damages to Chestnut evidenced an intent to find for her on one or more of her causes of action, Chestnut says the verdict was properly molded to reflect such intent.

The court's denial of defendant Clover's post-trial motions based on the jury's inconsistent verdict makes a detailed analysis of Chestnut's argument on this issue unnecessary. It is enough to note that in molding the verdict in favor of plaintiff Chestnut, the court found that the jury did evidence an intent to find for her on her false imprisonment claim.

In *City of Philadelphia, Police Department v. Gray* and *Williams v. SEPTA,* 534 Pa. 467, 633 A.2d 1090 (1993), a case in which a jury provided inconsistent answers to interrogatories concerning the negligence of the defendant bus company, the Pennsylvania Supreme Court cited the waiver rule first enunciated in *Dilliplaine v. Lehigh Valley Trust Company,* 457 Pa. 255, 322 A.2d 114 (1974), and held that:

"[Plaintiff] did not object to the inconsistency of the jury's answers to the interrogatories when the verdict was rendered. Instead, she raised this issue for the first time in her post-trial motions. Because this issue was not preserved at trial, we must find that it was waived." *Williams, supra* at 477-78, 633 A.2d at 1095.

More recently, the Superior Court of Pennsylvania applied the holding in *Williams* to decide a similar case in which the jury's inconsistent answers to interrogatories were challenged for the first time in post-trial motions. In *Curran v. Greate Bay Hotel and Casino,* 434 Pa. Super. 368, 643 A.2d 687 (1994), the court found that:

"[T]he party seeking a new trial failed to request a correction of the verdict before the jury was discharged. Despite the obvious problem with the jury verdict, [appellant] did not seek to have the inconsistencies resolved until it filed post-trial motions. Thus, we do not have the option of seeking clarification of the jury's verdict and must enter judgment according to the verdict pronounced by the jury. It is this failure to act before the jury was discharged that constitutes waiver.... The purpose of requiring action is to enable the jury to correct an obvious mistake." *Id.* at 376, 643 A.2d at 690. (footnote omitted) *Accord Picca v. Kriner,* 435 Pa. Super. 297, 645 A.2d 868 (1994).

In the instant case, the jury returned its verdict with the jury foreperson responding to each interrogatory as it was read aloud by the court crier. Thereafter, each of the lawyers for the plaintiffs and the defendant was given an opportunity to poll the jury, which each declined. The court then directed that the verdict be recorded and the jury was dismissed.

At no time prior to dismissal of the jury did Clover object to the jury's verdict in the Chestnut case and thereby make it possible to have the verdict's apparent inconsistencies resolved by the jury itself. Instead, like the plaintiff in *Williams* and the appellant in *Curran,* Clover first raised the inconsistency issue in its post-trial motions. And so, like them, Clover must be seen as waiving any objection to the Chestnut verdict as delivered. Clover's motion for judgment notwithstanding or, alternatively, a new trial based on verdict inconsistency in the Chestnut case is therefore denied.

## 2. Defendant Clover's Contention That the Trial Court Erred in Not Charging the Jury on the Existence of Probable Cause As a Matter of Law for Clover To Detain Plaintiff Chestnut

Defendant Clover next claims that the court erred in submitting to the jury the question of whether its employees had probable cause to detain plaintiff Chestnut. Clover contends that probable cause to detain Chestnut—as "probable cause" is used in the retail theft statute, 18 Pa.C.S. §3929—existed as a matter of law and that the jury should have been so charged.[2] Clover is correct in this contention.

---

2. 18 Pa.C.S. §3929 reads, in pertinent part, as follows:

"(a) Offense defined—A person is guilty of a retail theft if he:

"(1) takes possession of, carries away, transfers or causes to be carried away or transferred, any merchandise displayed, held, stored

In a case similar to the one at bar in which a shopper brought suit against a department store after she was detained on suspicion of retail theft, the Superior Court addressed the issue of probable cause as follows:

"The want of probable cause is a matter for the court and not the jury when there is no conflict in the evidence, or only slight differences in collateral matter....

"It is only when there is a variance in the testimony that the jury must be utilized to determine factual issues." *Daley v. John Wanamaker Inc.,* 317 Pa. Super. 348, 357, 464 A.2d 355, 360 (1983) (quoting *DeSalle v. Penn Central Transportation Co.,* 263 Pa. Super. 485, 491, 398 A.2d 680, 683 (1979)).

The *Daley* court then went on to find that the existence of probable cause or lack thereof had been properly submitted to the jury because the testimony in that

---

or offered for sale by any store or other retail mercantile establishment with the intention of depriving the merchant of the possession, use or benefit of such merchandise without paying the full retail value thereof; ...

"(4) under-rings with the intention of depriving the merchant of the full retail value of the merchandise ...

"(d) Detention—A peace officer, merchant or merchant's employee or an agent under contract with a merchant, who has probable cause to believe that retail theft has occurred or is occurring on or about a store or other retail mercantile establishment and who has probable cause to believe that a specific person has committed or is committing the retail theft may detain the suspect in a reasonable manner for a reasonable time on or off the premises for all or any of the following purposes: to require the suspect to identify himself, to verify such identification, to determine whether such suspect has in his possession unpurchased merchandise taken from the mercantile establishment and, if so, to recover such merchandise, to inform a peace officer, or to institute criminal proceedings against the suspect. Such detention shall not impose civil or criminal liability upon the peace officer, merchant, employee, or agent so detaining."

case "was in conflict from the most important aspects of the incident to the most insignificant." *Daley,* at 358, 464 A.2d at 360.

In this case, despite the assertions of Chestnut in her post-trial motions,[3] the testimony regarding her actions up to the point she was detained is not in conflict. In fact, most of her and her companion's activities to that point are captured on videotape. (Def. exhibit D-1.) The videotape shows Chestnut, Bridgette and Alphonse McIntosh, and Karla Rone shopping together as a group. It shows them sharing a single shopping cart. Chestnut herself testified that she didn't recall whether she placed any items in the shared cart. (N.T., 2/15/94, 97.) However, the Clover security employee watching the television monitors testified that she did see Chestnut placing items in the cart (N.T., 2/16/94, 370), and the videotape appears to bear her out in this regard. There is no dispute that items in the group's shared cart were under-rung by a total of $128.15. And there is no dispute that no one in the group made any effort to correct the error.[4]

---

3. The court notes that Chestnut—unlike McIntosh—does not argue that Clover waived any objection to the lack of a charge on probable cause. In any event, the court is satisfied that Clover did preserve the probable cause issue for appeal in Chestnut's case, just as it did in McIntosh's. See *infra* part III.A.3. As such, Clover's argument is addressed on its merits.

4. Even if it is assumed, arguendo, that the plaintiffs were not aware of the under-rings and were not, therefore, in a position to point them out, this would not affect whether the employees of defendant Clover had probable cause to detain them. A mistake as to whether a person is committing or has committed a crime does not eviscerate probable cause to detain that person as long as "the facts and circumstances within the knowledge of the officer, or of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in believing that the suspect has committed or is committing a crime." *DeSalle, supra* at 492, 398 A.2d at 683.

Chestnut makes much of the fact that Helen Bobb, the Clover security employee watching the television cameras, had the following colloquy with Chestnut's counsel during cross-examination:

"Q. Miss Bobb, we've heard you testify about what you thought probable cause was, and I just wanted to ask you a question. If an individual comes to the cashier, pays full price for merchandise, is that probable—is there probable cause to suspect that person has committed a crime?

"A. No.

"Q. So your testimony has been up until the cashier point there's no probable cause to stop, and you're now telling us there's no probable cause to stop an individual who pays in full; correct?

"A. Why would you stop someone that pays full price?

"Q. And in fact, there's no probable cause to stop Oona up to the point of the cash register and there's no probable cause to stop her beyond because she paid in full; isn't that correct?

"A. That's correct." (N.T., 2/16/94, 351-352.)

Chestnut points to this answer as evidencing a sufficient conflict in the testimony as to the existence of probable cause to send the issue to the jury. Chestnut is mistaken. Even when taken alone, outside the context of her testimony as a whole, Bobb's answer is an opinion, completely collateral to the *facts* of what transpired that day. *Daley v. John Wanamaker, supra.* And when seen in light of the fact that it was Bobb herself who directed the security guards to detain Chestnut and her friends, the possibility exists that Bobb's answer during the above colloquy was the result of some confusion. Regardless, however, the attendant circumstances lead-

ing up to Chestnut's detention were not disputed. As such, it was for the court, not Ms. Bobb and not the jury, to determine whether Clover's security personnel had probable cause to detain Chestnut in light of those attendant circumstances.

Probable cause was defined by the Pennsylvania Supreme Court in *Kelley v. General Teamsters, Chauffeurs, and Helpers, Local Union 249,* 518 Pa. 517, 544 A.2d 940 (1988). In *Kelley,* a malicious prosecution case, the court held that probable cause exists when there is "a reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that the party is guilty of the offense." *Id.* at 523, 544 A.2d at 942 (quoting *Miller v. Pennsylvania Railroad Co.,* 371 Pa. 308, 314, 89 A.2d 809, 811-12 (1952)).

Chestnut and her companions shopped as a group, shared a shopping cart in which Chestnut herself placed items, and were together at the checkout lane where items from the cart were under-rung to the tune of $128.15. These circumstances were sufficient to warrant Clover security personnel's belief that Chestnut was guilty of the offense of retail theft. Consequently, the Court should have charged the jury that Clover's security personnel had probable cause to detain Chestnut as a matter of law.

### 3. Defendant Clover's Contention That the Trial Court Erred in Not Charging the Jury on the Existence of Probable Cause As a Matter of Law for Clover To Detain Plaintiff McIntosh

Defendant Clover similarly claims that the court erred in submitting to the jury the question of whether its employees had probable cause to detain plaintiff McIntosh. Again, Clover contends that probable cause to

detain McIntosh—as "probable cause" is used in the retail theft statute, 18 Pa.C.S. §3929—existed as a matter of law and that the jury should have been so charged. For substantially the same reasons as in the Chestnut case above, the court agrees.

In her post-trial motions, McIntosh argues that Clover failed during the trial to raise the issue of whether its security personnel had probable cause as a matter of law to detain her. As a consequence, McIntosh alleges that any subsequent objection to the court's failure to charge the jury on probable cause was waived by Clover.

Rule 227.1(b) Pa.R.C.P. states that:

"Post-trial relief may not be granted unless the grounds therefor,

"(1) if then available, were raised in pre-trial proceedings or by motion, objection, point for charge, request for findings of fact or conclusions of law, offer of proof or other appropriate method at trial; and

"(2) are specified in the motion. The motion shall state how the grounds were asserted in pre-trial proceedings or at trial. Grounds not specified are deemed waived unless leave is granted upon cause shown to specify additional grounds." *Accord Dilliplaine v. Lehigh Valley Trust Company, supra.*

At the close of McIntosh's case, Clover's counsel moved for a nonsuit, arguing that "the Retail Theft Act, which is applicable in this matter, provides for civil immunity or immunity from civil suit if there is probable cause for a stop, which has been admitted by [McIntosh's] counsel in the opening and throughout the case as of this time and if the actions were reasonable." (N.T., 2/15/94, 174.) The court subsequently denied Clover's motion for a nonsuit, reasoning that

"whatever activity took place in the [back] room there I think is a question for the jury." (N.T., 2/16/94, 193.)

Later, toward the end of Clover's case, Clover's counsel informed the court that "from a procedural standpoint I want to make sure that it's known that prior to resting my case what I would be requesting is the court to move for a directed verdict on both matters, in both the McIntosh claim [sic]." (N.T., 2/17/94, 529-530.) The court responded with the following:

"I am writing up the charge now, and as I go through the charge, I analyze all of these legal elements to see if there's evidence in my opinion to support them, and if there isn't, why I'll grant a directed verdict on the one there's no evidence on. If there is, I can't grant a directed verdict." (N.T., 2/17/94, 530.)

Later still, in a discussion with counsel concerning punitive damages, the court opined

"[H]ere's a girl [McIntosh] that admitted in effect that she participated in the under-ring for whatever that's worth, and she was stopped, and she was patted down. I think I could almost grant a directed verdict on the probable cause element here. I didn't do it." (N.T., 2/18/94, 572.)

In the opinion of this court, the foregoing exchanges were sufficient to preserve Clover's objection as to the lack of a charge on probable cause under Rule 227.1 (b)(1). And because in its post-trial motions Clover specifically referred to its motions for nonsuit and a directed verdict as the grounds for its appeal on the probable cause issue, the court finds that Rule 227.1 (b)(2) was satisfied also. As such, McIntosh's argument that Clover waived any objection as to the lack of charge on probable cause is rejected.

McIntosh next argues that it was properly a question for the jury whether Clover's security personnel had probable cause to detain her. The court, however, is mindful of the fact that McIntosh—unlike Chestnut—was the actual beneficiary of an under-ring. Therefore, not only did McIntosh and her companions shop as a group, share a shopping cart in which McIntosh herself placed items, and were together at the checkout lane where items from the cart were under-rung to the tune of $128.15, but McIntosh was also the recipient of goods with a retail value of $14.46 for which she tendered $6.22. Under these circumstances, the *Kelley* standard for probable cause was undoubtedly met. The court, therefore, should have charged the jury that Clover's security personnel had probable cause to detain McIntosh as a matter of law.[5]

---

5. It is interesting to note that McIntosh's own counsel conceded to the jury that Clover employees had probable cause to detain his client. In his closing argument, Mr. D'Aniello, McIntosh's counsel, said the following:

"You have to decide at that point if they had probable cause to stop Bridgette McIntosh.

"His Honor is going to read the Retail Theft Act to you. You have to decide if they had probable cause to believe that Bridgette McIntosh says a specific person committed an under-ring. You have to decide if they have probable cause to stop her. That's going to be one of your questions.

"And I'm going to make this giant concession to you. Yes, they had a right to stop her. The girl is walking out of the store with more than she paid for. They had the right to stop her. They had the right to act reasonably." (N.T., 2/18/94, 590-91.)

Possibly, counsel for McIntosh mistakenly merged the concept of "probable cause" to detain under the retail theft statute with the concept of "[detention] in a reasonable manner for a reasonable time" under the same statute, and that in arguing the latter, he unwittingly conceded the former. Whatever the case, it is true that whether McIntosh was detained "in a *reasonable manner* for a *reasonable time*"

## 4. Defendant Clover's Motions for Judgment Notwithstanding the Verdict or, Alternatively, a New Trial in Both the Chestnut and McIntosh Cases

Defendant Clover claims that the jury's inconsistent verdict in the Chestnut case, as well as the court's failure to charge the jury on the existence of probable cause as a matter of law in both the Chestnut and the McIntosh cases, are grounds for judgment notwithstanding the verdict or, alternatively, a new trial in both cases.

As discussed *supra* part III.A.1, Clover's post-trial objection to the jury's inconsistent verdict in the Chestnut case was waived and hence cannot serve as the basis for either a judgment notwithstanding the verdict or a new trial. However, as discussed *supra* parts III.A.2 and III.A.3, Clover's contention is correct that the court erred in not charging the jury that its security personnel had probable cause as a matter of law to detain plaintiffs Chestnut and McIntosh. This failure of the court to so charge the jury serves as the basis for a new trial in both the Chestnut and McIntosh cases. The new trial for each will be limited to plaintiffs' false imprisonment claims.

In *Noyes v. Cooper,* 396 Pa. Super. 592, 579 A.2d 407 (1990), a case in which the Superior Court ordered a new trial after finding that the trial judge erroneously charged the jury on liability for fraud, the court held:

"[F]or a party to be entitled to a new trial (on the basis of erroneous jury instructions), the instructions complained of must be fundamentally in error, and it

---

was a legitimate question of fact for the jury to decide. (emphasis added) See *infra* note 9. As conceded by Mr. D'Aniello, however, it is *not* true that whether *probable cause existed for the detention was similarly such a question.*

must appear that the erroneous instructions might have been responsible for the verdict." *Id.* at 601, 579 A.2d at 411 (quoting *Hawthorne v. Dravo Corporation, Keystone Division,* 352 Pa. Super. 359, 368, 508 A.2d 298, 302-03 (1986)). *Accord McCann v. Amy Joy Donut Shops, A Division of American Snacks Inc.,* 325 Pa. Super. 340, 472 A.2d 1149 (1984).

In the cases at bar, the court charged the jury on the component elements of each claimed cause of action. Included in the charge was a discussion of probable cause. (N.T., 2/18/94, 678-79, 684.) The court then went over the verdict report question by question, reading each question out loud. (N.T., 2/18/94, 689-701.)

The verdict report consisted of specific interrogatories for each element of the plaintiffs' claimed torts.[6] These were followed by two questions under the heading "probable cause."[7] The layout for each of the "probable cause" sections was identical to the one below:[8]

### "M. PROBABLE CAUSE

"(26) Was there probable cause under the retail theft statute for the detention of plaintiff Chestnut? Yes ___ No ___

---

6. Plaintiff Chestnut claimed assault, battery, false imprisonment, and intentional infliction of severe emotional distress. Plaintiff McIntosh claimed assault, battery, and false imprisonment. Her claim for intentional infliction of severe emotional distress was nonsuited.

7. All but one of the plaintiffs' claimed torts were followed by a "probable cause" section on the verdict report. The single exception was Chestnut's claim for intentional infliction of severe emotional distress.

8. On the verdict report, this "probable cause" section followed interrogatories on Chestnut's false imprisonment claim.

"(If you answer question 26 'no,' do not answer any further questions in section M and proceed to section N)

"(27) Was the detention in a reasonable manner and for a reasonable period of time? Yes __ No __

"(If you answer question 27 'yes,' plaintiff Chestnut cannot recover on false imprisonment. If you answer question 27 'no,' proceed to section N)."

The jury checked the "no" box for each of the interrogatories asking whether there was probable cause under the retail theft statute to detain the plaintiffs. By so doing, and in then following instructions, it never answered the interrogatory as to whether the detention was done in a "reasonable manner and for a reasonable period of time."

Lack of probable cause was not an element of either plaintiff's cause of action for assault and battery. These causes of action were listed on the jury's verdict report, and in each case the jury found that one of the elements for each had not been proven. Accordingly, whether there was probable cause or not was irrelevant.

However, the jury did find that the elements of plaintiff McIntosh's cause of action for false imprisonment had been proven. As such, the affirmative defense provided by the retail theft statute with its attendant considerations of probable cause and "reasonable manner, reasonable time" became relevant.

As noted *supra* part III.A.3, it is this court's opinion that the failure of the undersigned to instruct the jury that probable cause to detain McIntosh existed as a matter of law was prejudicial error. The only outstanding issue to determine, therefore, was whether the detention was in a reasonable manner and for a reasonable time.

But the jury never answered that question because it answered the probable cause question in the negative.

With respect to plaintiff Chestnut's cause of action for false imprisonment, the absence of a jury answer to the "reasonable manner, reasonable time" interrogatory was similarly critical. This is so because although the jury returned an inconsistent verdict for Chestnut, this court, finding that the jury had evidenced an intent to find for her on her false imprisonment claim, subsequently molded the verdict in her favor. See *supra* footnote 1. Just as in the case of McIntosh, therefore, the protections of the retail theft statute became the only way defendant Clover could avoid liability for the false imprisonment of Chestnut. And since probable cause to detain Chestnut existed as a matter of law (see *supra* part III.A.2), the jury's answer to the question of whether Clover's detention of Chestnut was done in a reasonable manner and for a reasonable period of time was important in determining Clover's liability.[9]

In light of the above, and following the holding in *Noyes,* this court can only conclude that the failure to charge the jury as to the existence of probable cause to detain as a matter of law—with the consequent absence of a jury determination as to whether the detention was "in a reasonable manner and for a reasonable period of time"—was "fundamentally in error," and that "the erroneous instructions might have been responsible for the verdict" in both the Chestnut and the McIntosh

---

9. The court is satisfied—in light of minor plaintiffs' testimony that they were teased about going to jail and were never told specifically what they had allegedly done—that the question whether Clover's detention of Chestnut and McIntosh was done "in a reasonable manner for a reasonable time" under the retail theft statute was properly for the jury to decide.

verdicts. *Noyes v. Cooper, supra.* As such, a new trial in both cases is appropriate.

Finally, the new trials in both cases must be limited to plaintiffs' false imprisonment claims.

In *Simmons v. St. Clair Memorial Hospital,* 332 Pa. Super. 444, 481 A.2d 870 (1984), a trial court's grant of a new trial on all issues was reversed because such a trial might have overturned the jury's verdict on the negligence of the defendant hospital's employees when there had been no contention of error as to that particular negligence cause of action.

In both cases at bar, neither the plaintiffs nor the defendant have alleged error as to the battery or assault claims of either Chestnut or McIntosh. Similarly, no error has been alleged as to Chestnut's claim for intentional infliction of severe emotional damage. There is, therefore, no need to relitigate those issues and the jury's verdict as to them must stand. The court denies plaintiffs' petitions for new trials solely on the issue of punitive damages. See *infra* parts III.B and III.C. This leaves plaintiffs' false imprisonment claims as the sole outstanding issues to re-try. Accordingly, a new trial limited to their false imprisonment claims is ordered for both plaintiffs Chestnut and McIntosh.

B. *Plaintiff Chestnut's Motion for New Trial on the Issue of Punitive Damages Only*

Plaintiff Chestnut's Contention That the Trial Court Erred by Not Charging the Jury on Punitive Damages for All Actions of Defendant Clover

The court instructed the jury that it could award punitive damages on plaintiff Chestnut's cause of action for emotional distress. However, the jury found against Chestnut on this cause of action as it also did on her

assault and battery claims. Chestnut contends that the court erred by refusing to charge the jury on punitive damages in conjunction with *all* of defendant Clover's actions associated with its detention of her, instead limiting the jury charge on punitive damages solely to the alleged manner in which she was touched. Chestnut claims that because whether defendant Clover had probable cause to detain her was questionable, this alone engendered a jury question as to whether the detention itself and *all* of Clover's subsequent actions—not just the alleged manner of touching—were outrageous and consequently deserving of punitive damages.

This court has determined that Clover did have probable cause to detain Chestnut as a matter of law. It follows, then, that her claims for punitive damages based solely on the asserted questionability of probable cause are moot. Chestnut's motion for a new trial on the issue of punitive damages only is therefore denied.

### C. Plaintiff McIntosh's Motion for New Trial on the Issue of Punitive Damages Only

Plaintiff McIntosh's Contention That the Trial Court Erred by Not Charging the Jury on Punitive Damages

Plaintiff McIntosh contends that the court erred by refusing to charge the jury on punitive damages in conjunction with defendant Clover's detention of her. McIntosh argues that because she presented evidence to support her claims of assault, battery, and false imprisonment, the intentional nature of these torts was alone sufficient to send the question of punitive damages to the jury. McIntosh goes on to assert that the length of time she was detained by Clover, the comments Clover employees made to her during that time, and the fact she

was led away in handcuffs by the police, all combined to bring about a jury question on punitive damages. The court is not persuaded by these arguments.

Pennsylvania has adopted the rule set forth in the Restatement (Second) of Torts §908(2) regarding the imposition of punitive damages: "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Feld v. Merriam,* 506 Pa. 383, 395, 485 A.2d 742, 747-48 (1984). "[R]eckless indifference to the rights of others" for purposes of imposing punitive damages is defined by the Pennsylvania Supreme Court as "where the 'actor knows, or has reason to know, ... of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk.' " *Martin v. Johns-Manville Corp.,* 508 Pa. 154, 170-71, 494 A.2d 1088, 1097 (1985) (quoting the Restatement (Second) of Torts §500, comment a). It is up to the trial judge to "determine whether the plaintiff has presented sufficient evidence to support a punitive damages claim, *i.e.,* facts from which the jury might reasonably conclude that the preponderance of the evidence establishes outrageous conduct by the defendant." *Id.* at 173, 494 A.2d at 1098.

McIntosh presented evidence to support her claims of assault, battery, and false imprisonment against Clover. The fact that these torts are classified as "intentional" was sufficient, she claims, to send the question of punitive damages to the jury. In so arguing, however, McIntosh ignores the threshold requirement in Pennsylvania for awarding punitive damages, *i.e.* the conduct complained of must be "outrageous," *Martin v. Johns-Manville Corp., supra,* or "egregious," *Dean Witter Reynolds Inc. v. Genteel,* 346 Pa. Super. 336, 499 A.2d

637 (1985). This requirement means that punitive damages analysis does not end the moment evidence supporting an intentional tort claim is presented because "intentional" does not automatically mean "outrageous" or "egregious." Were it otherwise, *every* intentional tort, no matter how innocuous, would serve as the basis for punitive damages. Such is obviously not the case, and McIntosh's argument to the contrary must fail.

The court similarly rejects McIntosh's contention that the length of her detention, as well as comments Clover employees allegedly made to her during that time, and the fact she was led away in handcuffs by police, created a jury question as to punitive damages. The court agrees that McIntosh presented evidence sufficient to create a jury question whether Clover's detention of her was "reasonable" under the retail theft statute. See *supra* note 9. But using its discretion under *Martin*, the court does not agree that detaining her for approximately two hours, teasing her about going to jail, or failing to tell her exactly why she was being held, supported a jury question as to whether Clover's employees acted with "evil motive," or "reckless indifference" to her rights. *Feld v. Merriam, supra.* And Clover cannot be held liable for the police handcuffing McIntosh after they had taken her into custody.

In light of the foregoing, McIntosh's contention that the court erred by not charging the jury on punitive damages is rejected, and her motion for a new trial on the issue of punitive damages only is denied.

## IV. CONCLUSION

In both the Chestnut and McIntosh cases, the court erred in not charging the jury that defendant Clover's security personnel had probable cause as a matter of law to detain plaintiffs Chestnut and McIntosh. This

failure of the court to so charge the jury serves as the basis for a new trial in both cases. The new trial for each will be limited to plaintiffs' false imprisonment claims.

## ORDER

And now, December 8, 1994, plaintiff McIntosh's and plaintiff Chestnut's motion for a new trial on punitive damages is hereby denied. Plaintiff McIntosh's and plaintiff Chestnut's motion for delay damages is hereby denied. Defendant Clover's motions for either judgment notwithstanding the verdict or remittitur is hereby denied for both cases. Defendant Clover's motion for a new trial is hereby granted in both cases limited solely to plaintiff Chestnut's and plaintiff McIntosh's false imprisonment claims.